**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NILES P. BALTIMORE, | Case No. ED CV 17-1039-AS |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | |

**PROCEEDINGS**

On May 24, 2017, Plaintiff filed a Complaint seeking review of the denial of his application for Supplemental Security Income ("SSI"). (Dkt. No. 1). The parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 11-12). On October 26, 2017, Defendant filed an Answer along with the Administrative Record ("AR"). (Dkt. Nos. 18, 19). On February 9, 2018, the parties filed a Joint Stipulation ("Joint Stip."), setting forth their respective positions regarding Plaintiff's claims. (Dkt. No. 23).

The Court has taken this matter under submission without oral argument. See C.D. Cal. L.R. 7-15.

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On September 19, 2012, Plaintiff, formerly employed as a roofer and a restaurant busboy, (see AR 313), filed an SSI application, alleging an inability to work since November 10, 2005, due to a "traumatic head and back injury."[1] (AR 288, 308, 312). Plaintiff's applications were denied initially on September 13, 2013, (AR 217), and upon reconsideration on January 7, 2014. (AR 224). On June 17, 2015, an Administrative Law Judge, Alan J. Markiewicz ("ALJ"), heard testimony from Plaintiff, who was represented by counsel, and a vocational expert, Troy Scott ("VE"). (See AR 44-74). On September 11, 2015, the ALJ issued a decision denying Plaintiff's application. (See AR 25-36).

The ALJ applied the five-step sequential process in evaluating Plaintiff's case. At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since September 19, 2012, the date on which the application was filed. (AR 27). At step two, the ALJ found that Plaintiff has the following severe impairments:

---

[1] In November 2005, when Plaintiff was nineteen, he was working on a roof when he fell two stories through a skylight, causing a traumatic brain injury. (See AR 53-54, 88-89). Plaintiff filed an SSI application in 2006, and he was awarded benefits in 2008. (See AR 47-48, 131-38). Those benefits soon terminated when Plaintiff received a workers' compensation lump sum settlement. (See AR 48). When those funds had depleted, Plaintiff filed the 2012 SSI application at issue here. (Id.).

2

history of a traumatic brain injury; seizure disorder; cognitive disorder not otherwise specified; and mood disorder not otherwise specified.[2] (Id.). At step three, the ALJ found that Plaintiff's impairments do not meet or equal a listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 28).

Before proceeding to step four, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC")[3] as follows:

> [Plaintiff can] perform medium work[4] . . . except [he] can lift and carry 50 pounds occasionally and 25 pounds frequently; he can stand and walk for 6 hours in an 8-hour workday; he can sit for 6 hours in an 8-hour workday; he should avoid concentrated exposure to hazards; he is limited to work involving simple repetitive tasks; and he is limited to work involving no more than occasional contact with co-workers and the public.

(AR 29). At step four, the ALJ noted that Plaintiff is unable to perform any past relevant work. (AR 35). Relying on the VE's

---

[2] The ALJ found Plaintiff's history of L3 vertebra fracture to be non-severe. (AR 27-28).

[3] A Residual Functional Capacity is what a claimant can still do despite existing exertional and non-exertional limitations. See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c).

3

testimony at step five, the ALJ found that Plaintiff, with his age, education, work experience, and RFC, can perform the following representative jobs existing in significant numbers in the national economy: hand packager (Dictionary of Occupational Titles ("DOT") 920.587-018); cleaner (DOT 381.687-018); and landscape worker (DOT 406.687-010). (AR 36). Accordingly, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since September 19, 2012, the date the application was filed." (Id.).

The Appeals Council denied Plaintiff's request for review on April 24, 2017. (AR 1-3, 10, 18). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. See 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

This Court reviews the Administration's decision to determine if it is free of legal error and supported by substantial evidence. See Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). To determine whether substantial evidence supports a finding, "a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (internal quotation omitted). As a result, "[i]f the evidence

can support either affirming or reversing the ALJ's conclusion, [a court] may not substitute [its] judgment for that of the ALJ." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ failed to provide (1) specific and legitimate reasons for rejecting Plaintiff's treating physician's opinion and (2) clear and convincing reasons for rejecting his testimony regarding his functional limitations. (See Joint Stip. at 2-24).

**DISCUSSION**

The two issues Plaintiff raises are addressed below, beginning with the ALJ's assessment of Plaintiff's credibility, followed by the ALJ's decision to discount the opinion of Plaintiff's treating neurologist, Bernard Ullman, M.D. After considering the record as a whole, the Court finds that the Commissioner's findings are supported by substantial evidence and are free from material legal error.[5]

//

---

[5] The harmless error rule applies to the review of administrative decisions regarding disability. See McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (an ALJ's decision will not be reversed for errors that are harmless).

5

**A.   The ALJ Did Not Err in Evaluating Plaintiff's Credibility**

An ALJ's assessment of a claimant's credibility is entitled to "great weight."  See Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  In order to determine whether a claimant's testimony is credible, the ALJ engages in a two-step analysis.  Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014).

First, the claimant "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A)(1988)).  In producing evidence of the underlying impairment, "the claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof."  Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996), superseded on other grounds, 20 C.F.R. § 404.1529(c)(3).  Instead, the claimant "need only show that [the impairment] could reasonably have caused some degree of the symptom."  Id.

Second, once the claimant has produced the requisite objective medical evidence, the "ALJ may reject the claimant's testimony

regarding the severity of her symptoms." Id. at 1284. Absent affirmative evidence of malingering, however, the ALJ may reject a plaintiff's testimony only "by offering specific, clear and convincing reasons for doing so." Id. In assessing a claimant's alleged symptoms, an ALJ may consider the following:

> (1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears to be less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

Id. An ALJ may also consider "the claimant's work record and observations of treating and examining physicians and other third parties." Id.

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC finding. (AR 31; see also AR 30 (ALJ stating that he considered the relevant factors and concluded that Plaintiff's "allegations are less than fully credible").

The ALJ's finding that Plaintiff "has engaged in a somewhat normal level of daily activity and interaction," which "diminishes the credibility of his allegations of functional limitations," (AR 30), is supported by the record. Plaintiff's daily activities, as the ALJ correctly noted, include "caring for his own personal hygiene, preparing simple meals, completing basic household chores, using a computer, visiting with friends, reading, playing video games, driving, and attending church." (AR 30; see AR 60-67, 329-32, 367). The ALJ found that performing these activities requires some of the same physical, mental, and social abilities that are needed to obtain and maintain employment. (AR 30). The ALJ also remarked that some of Plaintiff's activities, "such as driving, reading, and playing video games, also require a normal level of memory and concentration." (Id.).

Plaintiff contends that his alleged impairments – "mood swings, difficulty getting along with others, and memory impairment" – "would not necessarily prevent the completion of basic activities of daily living but would interfere with gainful activity." (Joint Stip. at 15). Plaintiff also contends that his ability to perform daily activities (such as household chores and driving) "fluctuate[s]," so that there are times when he cannot do these activities. (Id. at 23). He states that this "is due, in part, to his anger outbursts and difficulty completing tasks." (Id. (citing AR 394, 463)).

Plaintiff's ability to perform various everyday activities is a legitimate basis to discount Plaintiff's credibility. See Burch v.

Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005) (claimant's allegations of disability properly discredited where claimant was able to care for her own personal needs, cook, clean, shop, interact with her boyfriend, and manage finances). Although Plaintiff's activities do not necessarily show that he was unimpaired, the ALJ reasonably found them inconsistent with the level of impairment that Plaintiff alleged. See Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."). Moreover, the record does not support Plaintiff's claim that his ability to perform activities varies greatly. At the hearing, describing his pastime of playing computer games, Plaintiff responded that he plays "full games" "all day long," and he gave no indication that his condition sometimes makes him unable to do this. (See AR 61-64, 67). As for driving, he stated that he goes out about once a day, though he noted that he "get[s] overwhelm[ed] around like a lot of people," and avoids driving at night. (AR 62). The record supports a finding that Plaintiff has the ability to perform simple and repetitive tasks on a consistent basis.

In addition, the ALJ found that Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." (AR 31; see also AR 35 (ALJ stating Plaintiff "has received minimal treatment for the alleged conditions")). This was "evidenced by relatively infrequent trips to a doctor for the allegedly disabling impairments and significant gaps in treatment,"

as well as Plaintiff's admission in 2013 that he had not seen a neurologist for at least a year. (Id.; see AR 359). The ALJ remarked that Plaintiff's treatment was "essentially routine and conservative in nature, primarily in the form of medication." (AR 31). There was a "lack of more aggressive treatment, such as surgical intervention or in-patient mental health treatment," which suggested that Plaintiff's "symptoms and limitations were not as severe as he alleged." (Id.).

Plaintiff argues that his trips to the doctor have been infrequent because his condition is stable, but "[b]eing 'stable' does not mean a condition is not disabling." (Joint Stip. at 16). As support, Plaintiff cites Trevizo v. Berryhill, 871 F.3d 664, 677 (9th Cir. 2017), in which the Ninth Circuit remarked that "the failure of a treating physician to recommend a more aggressive course of treatment, absent more, is not a legitimate reason to discount the physician's subsequent medical opinion about the extent of disability." Plaintiff asserts that his "'conservative' and 'infrequent treatment' is in fact the kind of treatment to be expected for [his] medical condition, traumatic brain injury." (Joint Stip. at 21-22).

Plaintiff's treatment, however, does indeed appear to be minimal relative to his complaints. The record reflects that at least some of Plaintiff's impairments have been well controlled by medication. Plaintiff takes an anti-seizure medication, Depakote, for example, and his last seizure occurred around the time he fell off a roof, in

2005.  (AR 57-58; see AR 359 (treatment note referring to roof incident in 2005); AR 371 (treatment note remarking seizures "are under good control with [medication] Depakote").  His seizure disorder, therefore, was not disabling.  Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").  Other than Depakote, Plaintiff takes the painkiller Norco, which relieves his back pain.  (AR 57, 371, 375).  Plaintiff reported that his medications do not cause side-effects.  (AR 59).  He also testified that he used to see his neurologist about every six months, but lately had begun to see him only once a year, and he had not seen a psychologist in recent years.  (AR 56).  Plaintiff stated that he sees "a regular therapist, who . . . encourages [him] to try to do stuff, and socialize."  (AR 67).

It is reasonable to infer from this apparently mild medical treatment that Plaintiff's impairments are not as debilitating as Plaintiff attests.  Moreover, even if this was indeed the "expected" level of treatment for Plaintiff's "traumatic brain injury," it demonstrates that he is able to maintain his daily functioning and activities without more serious medical intervention.  Therefore, regardless of whether the lack of more aggressive treatment would alone suffice to discount Plaintiff's credibility, it reasonably supports the ALJ's determination that Plaintiff's claimed impairments are exaggerated.  See, e.g., Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995).

1 | The ALJ further found that "the objective medical evidence does
2 | not support the alleged severity of symptoms." (AR 35). He noted,
3 | for instance, that Plaintiff's "mental status examinations have shown
4 | no more than moderate cognitive limitations." (AR 35). Substantial
5 | record evidence supports this finding. (See, e.g., AR 367-69, 384,
6 | 387, 400-02). While this cannot be the sole reason to reject a
7 | claimant's credibility, see Bray v. Comm'r of Soc. Sec. Admin., 554
8 | F.3d 1219, 1227 (9th Cir. 2009), the ALJ appropriately considered it
9 | here as an additional basis for support the credibility finding.

Plaintiff additionally disputes the ALJ's reliance on his prior work history in assessing his credibility. The ALJ found that Plaintiff's "work history shows that he worked only sporadically prior to the alleged disability onset date, which raises a question as to whether his continuing unemployment is actually due to medical impairments." (AR 31; see AR 307 (Plaintiff's earnings history)). Plaintiff contends that the ALJ's reasoning "defies logic and ignores the fact that [Plaintiff], at his alleged onset date, was only 19 years old." (Joint Stip. at 17). However, even if Plaintiff's limited work history in his late teens neither demonstrates nor refutes his motivation to work, the error is harmless because the ALJ's other reasons provide sufficient support for the ALJ's assessment of Plaintiff's credibility. See Frost v. Berryhill, 727 F. App'x 291, 294 (9th Cir. 2018) (ALJ's error in using claimant's work history to rejecting physician's opinion was harmless error because the ALJ provided germane reasons for rejecting the opinion); Molina, 674 F.3d at 1115 ("[A]n error is harmless so long as there

remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'" (quoting Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004))).

Accordingly, the ALJ properly discounted Plaintiff's credibility by giving specific, clear, and convincing reasons that are supported by substantial evidence in the record.

**B.  The ALJ Did Not Err in Rejecting the Opinion of Treating Neurologist Bernard Ullman, M.D.**

Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability. Batson, 359 F.3d at 1195; Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); see also Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2); see Trevizo, 871 F.3d at 675-77. When a treating physician's opinion is not controlling, it is weighted based on factors such as the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record as a whole, and specialization of the physician. 20 C.F.R. § 416.927(c)(2)-(6).

If a treating or examining doctor's opinion is contradicted by another doctor, the ALJ must provide "specific and legitimate reasons" for rejecting the opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); Lester, 81 F.3d at 830-31. However, if a treating or examining doctor's opinion is not contradicted by another doctor, the ALJ can reject the opinion only for "clear and convincing reasons." Carmickle v. Commissioner, 533 F.3d 1155, 1164 (9th Cir. 2008); Lester, 81 F.3d at 830-31.

Plaintiff's treating neurologist, Dr. Ullman, opined that Plaintiff was totally disabled and unable to work. (AR 372, 463). The ALJ gave "little weight to this opinion because it is brief, conclusory, and inadequately supported by clinical findings." (AR 34). Additionally, the ALJ remarked that "[a]s an opinion on an issue reserved to the Commissioner, this statement is not entitled to controlling weight and is not given special significance pursuant to 20 CFR 404.1527(d) and 416.927(d) and SSR 96-5." (Id.).

In discounting Dr. Ullman's opinion that Plaintiff was totally disabled, the ALJ noted that Dr. Ullman "did not provide an explanation for this opinion or provide any specific functional limitations that prevented the claimant from working," and "did not provide medically acceptable clinical findings to support his

14

opinion." (Id.). The ALJ further found Dr. Ullman's opinion "inconsistent with the objective medical evidence as a whole . . . , which shows minimal treatment, no more than mild-moderate evidence of cognitive deficits, and generally normal activities of daily living, indicating his symptoms do not cause extreme limitations as the claimant has reported." (Id.). The ALJ also found Dr. Ullman's opinion to be "inconsistent with Dr. Ullman's own treatment records that document [Plaintiff's] symptoms were generally stable, [he] received minimal treatment throughout the period, and he was treated conservatively with an anti-seizure medication, although he had not experienced a seizure since 2005." (Id.).

The ALJ instead gave great weight to the state agency mental medical consultants, who opined that Plaintiff "should be limited to simple repetitive tasks and have limited interaction with the public." (AR 33; see AR 157-59, 181-82). The ALJ found "nothing of record to contradict" these opinions. (AR 33). The ALJ further noted that their consultative assessments of Plaintiff's limitations were "reasonable and consistent with the objective medical evidence, which shows some deficits in memory, but not to the extent the claimant has alleged; minimal treatment for the alleged mental health symptoms; good improvement in social functioning with therapy treatment; inconsistent treatment despite claiming disabling mental health symptoms; and generally unremarkable mental status examination findings." (AR 33-34).

Plaintiff contends that the ALJ erred in rejecting Dr. Ullman's opinion because the opinion was based on objective evidence, including MRI results and clinical findings. (Joint Stip. at 4-5). Plaintiff points in particular to a treatment note in which Dr. Ullman described Plaintiff's MRI results on June 12, 2015. (Id. at 4; see AR 462). Dr. Ullman remarked that the MRI "confirm[ed] the permanent damage to the brain," and "[t]he most significant [brain damage] involved the frontal lobe which prevents him from modulating anger but also following through on longterm plans." (AR 463). Dr. Ullman added that "[i]t is more difficult for him to concentrate and do working memory problems," and so "[i]n this regard, [Dr. Ullman] believe[d] [Plaintiff] is completely disabled." (AR 463).

The record supports the ALJ's finding that Dr. Ullman's opinion is inconsistent with the evidence as a whole, including Dr. Ullman's own treatment records. For example, when examining Plaintiff on April 11, 2012, Dr. Ullman observed that Plaintiff was "very stable," while remarking that Plaintiff's "[i]rritability has prevented him from obtaining gainful employment." (AR 372). On July 3, 2013, Dr. Ullman noted that Plaintiff "feels that he is better able to solve impulse control issues by stopping his own aggression," though Plaintiff still found it "very difficult to find a job and maintain a job because of not following through and becoming very impatient, and also having trouble with task orientation." (AR 371). Dr. Ullman noted that Plaintiff's mood had improved; his short-term memory was "much improved"; his speech was "fluent and nondysarthric," with no aphasia; and his "sensory, motor, and reflex exams [were] intact."

(AR 371). On the other hand, multitasking was difficult, and working memory was "compromised." (AR 371). On June 12, 2015, Dr. Ullman again found that Plaintiff's speech was fluent; his sensory, motor, and reflex exams were intact; and he did not have aphasia, agnosia, or apraxia; although his working memory was "somewhat slow." (AR 462).

Plaintiff's mental status exams appear normal throughout the record. On May 31, 2013, internal medicine consultative examiner Dr. Bryan H. To, M.D. found that Plaintiff was "oriented to time, place, person and purpose," and his "[m]emory appeared to be intact, as [Plaintiff] [was] able to recall relevant data pertaining to the current medical condition." (AR 362). Kathy Vandenburgh, Ph.D. conducted a consultative psychological evaluation on June 7, 2013. (AR 365-69). She found that Plaintiff was "generally pleasant," cooperative, and alert. (AR 367). Plaintiff "appeared to understand simple test questions"; his "thought processes were organized"; and his "[v]erbal response time was adequate." (AR 367). Plaintiff was able to focus on tasks and to persist at them without supervision. (AR 367). He could also recall seven digits forward and four backwards, and spell the word "world" backwards. (AR 367). She found that for the one-hour evaluation, Plaintiff was able to sustain concentration and maintain appropriate social interaction. (AR 368-69). Charlene Krieg, Ph.D., conducted a consultative psychological evaluation on August 21, 2013. (AR 380-84). She observed that Plaintiff was well oriented, cooperative, and able to understand test questions and follow directions. (AR 382). She also found that

Plaintiff's immediate, recent, and remote memory was intact, and his "level of insight and social judgment appeared to be within normal limits." (AR 383). Similarly, a mental status exam by a treating provider on February 17, 2015 showed that Plaintiff was alert and oriented, able to obey three-step commands, able to register and recall three out of three items after one and five minutes, and able to do serial sevens. (AR 387). These findings supported the ALJ's determination that Dr. Ullman's opinion was inconsistent with the objective medical record.

Furthermore, as discussed above, the record supports the ALJ's findings that Plaintiff has received minimal and conservative treatment and been able to engage in a variety of daily activities. Among other things, Plaintiff testified that he used to see Dr. Ullman about every six months, but lately had begun to see him only once a year. (AR 56; see also AR 359 (examination report from May 31, 2013, noting Plaintiff's last neurologist visit was a year ago).

The ALJ acknowledged that Plaintiff's brain damage caused certain functional limitations, which the ALJ appropriately accounted for in the RFC. For example, though the ALJ found Plaintiff's seizures to be "well controlled with the use of medications," the ALJ nonetheless "limited [Plaintiff's] exposure to hazards due to his remote history of seizures." (AR 33; see AR 29). Moreover, given the evidence of memory deficits, the ALJ limited Plaintiff to simple, repetitive tasks. (AR 29, 34). The ALJ also limited Plaintiff "to work involving no more than occasional contact with co-workers and

the public," in light of evidence that Plaintiff had difficulty getting along with others. (Id.).

Having accounted for these limitations, the ALJ reasonably concluded that the overall evidence conflicts with Dr. Ullman's opinion because it does not demonstrate an inability work. The ALJ, therefore, appropriately rejected Dr. Ullman's opinion, articulating specific and legitimate reasons for doing so. See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (treating physician's opinion may be discredited because it is "inadequately supported by clinical findings"); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001)(ALJ properly discounted treating physician's opinion for being "so extreme as to be implausible" and "not supported by any findings" where there was "no indication in the record what the basis for these restrictions might be"); Magallanes, 881 F.2d at 752 (ALJ's decision to reject the treating physician's opinion due to a lack of medical evidence was sufficiently "specific and legitimate" and based on substantial evidence in the record).

**ORDER**

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: July 23, 2018

/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE